**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>BADRIYAH AWAD A ALASMARI<br><br>Defendant | Case No. 00:00-cv-000 |

**DECLARATION OF CARLO JIMENEZ**

I, Carlo Jimenez make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am currently employed as a Supervisory Detention and Deportation Officer (SDDO) with the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position since February 2022. I am assigned to the Houston Contract Detention Center (HCDF), located in Houston, Texas. At the HCDF, I supervise ERO personnel and provide oversight of ICE operations in the facility. I have been employed by ICE ERO since February 2007.

2. As an SDDO, I am responsible for the supervision and oversight of ERO operations, including detention and removal of noncitizens, at the HCDF.

1

3. ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of all persons detained in its custody are among the agency's highest priorities, and ICE has protocols in place to ensure that any individual on a hunger strike within its detention facilities is promptly and appropriately addressed and treated, and that the safety, security, and order of the facility is maintained for the detainees, staff, contractors, volunteers, and visitors therein.

4. Badriyah Awad Alasmari A# 216 641 426 (the Defendant) is a citizen of Saudi Arabia and is presently detained at the HCDF under the immigration laws. She has been detained at the HCDF since June 25, 2025. Prior to that, she was detained at the Richwood Correctional Center, in Monroe, Louisiana from May 5, 2025, through June 25, 2025, where she officially began her hunger strike, before being transferred to the HCDF for higher level medical care.

5. As of June 30, 2024, the Defendant had missed approximately ninety (90) consecutive meals and was officially listed as being on a hunger strike by ICE Health Service Corps (IHSC) personnel. The Defendant's stated intent in engaging in a hunger strike is to be released from ICE custody.

6. Since the Defendant began her hunger strike, IHSC staff and HCDF through the use of a Arabic interpreter and/or in English, educated the Defendant about the adverse effects of nutritional deficits as a result of being on hunger strike. It has been explained to the Defendant that, if he continues the hunger strike, there will be health risks associated with starvation such as damage to vital organs and even death. Despite repeated efforts to convince her to eat, the Defendant has failed to cooperate and expressed her commitment to continue the hunger strike.

7. At the HCDF, the personnel have informed the Defendant that if she continues her hunger strike it may become necessary to seek a court order to involuntarily administer food and/or hydration and medical treatment to save her life.

8. In addition to ICE's paramount concerns about the health and wellbeing of ICE detainees, the death or injury of any detainee as a result of a hunger strike would also seriously affect the operations of ICE at the HCDF and adversely affect ICE efforts to maintain the safety, security and good order of the detention facility for the detainees, staff, contractors, volunteers, and visitors therein in the following ways:

   a. My foremost obligation is to maintain the safety and security of the ICE detainees housed at the facility and provide for the health and well-being of the detainees, which includes protection from self-harm. A facility cannot stand by and fail to intervene in self-injurious behavior that is completely antithetical to our mission of maintaining the health and safety of noncitizens under our care.

   b. Moreover, other detainees may engage in hunger strikes, whether or not with the intention of committing suicide by starving themselves to death. For a detainee to cause his own death without staff intervention would completely undermine DHS' obligation to render appropriate medical care and prevent detainee suicides.

   c. In addition to critical personal health and safety for each individual, general security and order in the facility can also be destabilized by hunger strikes, which risks harm to other persons in the facility, including detainees, staff, contractors, volunteers, and visitors. Perceptions may be formed by the ICE detained population that ICE will simply let a detainee die, without intervening to save him or her, which could lead to lowered morale, resentment, acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the facility. I am concerned that hunger strikes, and even other acts of a disruptive or violent nature, would be directed at staff and other providers, to express detainee anger, resentment, and frustration.

   d. If such disruptive acts were to occur, tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

e. Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the facility to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

f. Detainees who participate in hunger strikes may severely and permanently damage their health. This may also require immediate and long-term medical care which in turn may require DHS to unnecessarily divert and expend its limited resources when such action can be avoided with appropriate medical intervention.

g. In the absence of an adequate response to life-threatening hunger strikes, other detainees may participate in such activities in an attempt to change facility operations or exact concessions from facility management, rather than using other available means that do not threaten their health and wellbeing. For example, Detainees may initiate hunger strikes to pressure staff to transfer them away from the facility, or to gain their release from detention. Without the ability to intervene when medically necessary, the facility will be forced to choose between letting the detainee die and giving in to their demands. ICE supports detainees' ability to express concerns about their cases, and an array of options – short of life-threatening hunger strikes – is available to them, including:

   i. Pursuit of applications for relief and protection from removal in proceedings before a neutral immigration judge;
   ii. Submission of facility-specific informal and formal grievances (including emergency grievance processes and appeal processes) relating to any aspect of their detention, including medical care, which trigger prompt responses;
   iii. Submission of the online ERO Contact Form on the detainees' behalf by stakeholders, including interested individuals, nongovernmental organizations, faith-based organizations, and advocacy groups;[1]
   iv. Complaints to oversight entities within the Department of Homeland Security, including the Office of Inspector General, Office for Civil Rights and Civil Liberties, Office of Detention Ombudsman, as well as the ICE Office of Professional Responsibility; and
   v. Use of the Detention Reporting and Information Line, a toll-free service that provides a direct channel for detainees, family members, private attorneys, and other stakeholders to communicate directly with ICE ERO about detainee allegations and concerns.

h. Some detainees may merely voice threats to go on a hunger strike, diverting additional staff attention away from other detainees.

---

[1] This form is available at: https://www.ice.gov/webform/ero-contact-form.

4

      i. If a detainee is permitted to die from self-starvation, public perception of DHS and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

9. For the reasons stated above, to allow the Defendant to continue to refuse to eat and drink water would harm ICE's ability to protect detainees from self-harm and suicide, and operate the HCDF in a safe, secure, and orderly manner and it will be necessary to involuntarily administer nutrients and/or fluids to her, to prevent imminent bodily harm and/or death.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed June 30, 2025

*Carlo Jimenez*
Carlo Jimenez
Supervisory Detention and Deportation Officer
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Houston Contract Detention Facility
Houston, Texas