**July 02, 2025**

# UNITED STATES DISTRICT COURT
# FOR TSHE SOUTSHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, IMMIGRATION AND CUSTOMS ENFORCEMENT | Case No. |
| Plaintiff, | |
| v. | |
| BADRIYAH AWAD A ALASMARI | |
| Defendant | |

## DECLARATION OF ALISHA WREN, M.D.

I, Alisha Wren, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am a licensed, Board-Certified Emergency Medicine Doctor physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Clinical Director at the Houston Contract Detention Facility (HCDF) in Houston, Texas. I have held this position since August 1, 2020.

2. ICE is committed to ensuring that every Alien detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among agency's highest priorities, and IHSC has protocols in place to ensure that any Alien on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

1

3. As the Clinical Director at the HCDF, my duties include providing medical care for Aliens at the facility.

4. This declaration is made in support of the Complaint and Motion by the United States of America, to perform involuntary vital measurements,(including daily finger stick blood glucose checks, weekly urinalysis checks, daily urine dipstick analysis, weekly laboratory blood draw, involuntary daily physical examination, involuntary intravenous hydration as needed to maintain hemodynamic stability, and involuntary nasogastric tube feedings for Badriyah Awad A Alasmari (the Defendant)who is detained at the HCDF. Herein referred to as Alasmari.

5. I am the treating physician of the Defendant, and I make this declaration upon a review of her medical record and my examination and treatment of the Defendant.

6. The Defendant is a citizen of Saudi Arabia. She has been detained at the HCDF since June 25, 2025. Prior to that, she was detained at the Richwood Correctional Facility in Monroe, LA, from May 05, 2025, to June 25, 2025.

7. She officially began her hunger strike on May 31, 2025, before being transferred to HCDF for higher level medical care.

8. On May 31, 2025, as of dinner, Defendant missed her ninth consecutive meal and was classified as a hunger striker pursuant to the IHSC Hunger Strike Directive 03-04, ERO Directive 11758. The Defendant states that she is on a hunger strike because she wants to be released from ICE custody. She is on day 31 of her official hunger strike and has missed 95 consecutive meals as of breakfast 07/02/2025.

9. Upon intake at HCDF on 06/25/2025, the Defendant weighed 116.8 pounds. She is 62 inches tall, with a body mass index (BMI) of 21.2 percent. Prior to transferring to the HCDF, the last pre hunger strike weight was 127.2 pounds on 05/31/2025. Her weight today, 07/02/2025,

2

is 109.2 pounds. Prior to arrival at HCDF, the Defendant was sent to the Emergency Department by the previous facility on 06/22/2025. She was diagnosed with "Malnutrition, UTI, fever, Hypoglycemia and Hypokalemia". She was prescribed medications on 06/22/2025 to treat her urinary bladder infection and her low potassium and she refuses both medications.

10. Since that time, she has refused all food, nutritional supplements Boost or Ensure, laboratory draw and analysis, medication, IV insertion, IV fluids and glucose tablets.

11. The Defendant was last evaluated by a licensed clinical social worker on 06/29/2025. At that time, she was found to be alert and oriented. There is no evidence of a psychiatric condition that would cause her not to eat or drink. She appears to be operating under her own free will.

12. The Defendant has been counseled by medical staff on the effects of self-imposed dehydration and starvation on her body. She has also been informed of the involuntary hydration and feeding procedures that will be pursued to prevent injury and/or death to herself should she continue not to eat.

13. The Defendant is on day# 31 of her hunger strike. She remains in custody at HCDF and is admitted to the medical infirmary.

14. The Defendant's medical condition has been deteriorating since her arrival at HCDF on 06/25/2025. On 06/26/2025 around 1:30pm, Alasmari became dizzy and fainted. She was sent out to the Emergency Department on 06/26/2025. She returned with a diagnosis of starvation, malnutrition, dehydration and weakness due to starvation. Since her arrival, she has not eaten any food. She does drink water up to 2 liters per day.

15. Laboratory tests are needed to evaluate the metabolic state to include electrolytes and kidney function. Alasmari is on Hunger Strike which compromises the kidney.

3

16. We evaluate the function of the kidney by drawing blood and ordering a Renal Panel, including a check of Magnesium and Phosphorous.

17. The laboratory test that need to be obtain during a hunger strike include:

    a. Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests BUN (blood urea nitrogen) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.

    b. Complete blood count. This test reveals the hemoglobin level.

    c. Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.

    d. Thiamine levels to assess deficiency at day 14 of a hunger strike.

    e. Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

    f. Creatine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

    g. Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35

      mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

    h. Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time as long as a patient fails to consume adequate nutrition.

    i. The prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL.

18. It is difficult to predict how long the human body can survive without food; if an individual does not have adequate fat stores, the time decreases significantly. If an individual goes without water for approximately eight to ten days, he/she will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest. The Defendant's condition is expected to decline as hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization.

19. Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

20. Alasmari has lost approximately 17% of her weight.

21. The medical staff has explained to the Defendant the medical necessity to eat to preserve her health and the medical risks of continuing her hunger strike. Other staff members have repeatedly talked to Alasmari, in attempts to convince her to eat solid foods, liquid

5

or bland diets, and/or drink nutritional supplements. However, the Defendant has continued to refuse to eat solid food and/or drink nutritional supplements.

22. I have explained to the Defendant my concerns regarding her condition and the medical risks involved with a continuing lack of nourishment. That is, she risks significant and ongoing metabolic changes induced by her refusal of nutritional intake. If she continues her hunger strike, she will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to her kidneys, liver, heart failure and the risk of death. The Defendant stated to me that she would continue her hunger strike.

23. In my professional medical judgment, if the Defendant continues her hunger strike, with the aggravating factor of inappropriate oral hydration, she will reach the point where she will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to the internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest.

24. When medical intervention is required, it will be necessary to feed the Defendant a nutritional supplement through a nasogastric tube to provide her the nutrition she needs. Her present dehydration also requires intravenous fluid hydration to stabilize her blood pressure and heart rate and ameliorate the signs and symptoms of postural hypotension.

25. Also, it is necessary to perform laboratory tests and physical evaluation to monitor and assess her clinical condition. If her laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously

26. Based on the Defendant's current physical condition, and the fact that she has not had adequate nutritional intake for 31 days, nor had appropriate oral fluid intake, it is my

6

informed medical opinion to a reasonable degree of medical certainty that involuntary intravenous hydration and nasogastric feedings are required at this time. The lack of nutritional intake compounded by voluntary dehydration can drastically exacerbate the effects of hunger strike.

27. The issuance of a court order to perform involuntary feedings and hydration, blood draws and all necessary physical examinations is medically necessary to preserve and sustain the Defendant' health, welfare, medical safety, and life.

28. To ensure the patient's health, welfare, medical safety, preservation of life. Should she refuse to cooperate with laboratory blood draws, involuntary hydration and/or involuntary nutrition, medical soft restraints, applied by custody staff, will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under perjury penalty that the foregoing is true and correct.

Executed July 02, 2025

Alisha A. Wren MD, ABEM, CCHP
Clinical Director
Houston Contract Detention Facility
Houston, Texas 77032

X _____
Dr. Alisha Wren
Clinical Director

7